**\*\*NOT FOR PRINTED PUBLICATION\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SONYA DIANE SCOTT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION No. 1:08CV774 |
| v. | § | |
| | § | |
| CLEVELAND CITY OF TEXAS; IKE | § | JUDGE RON CLARK |
| HINES, individually and in his official | § | |
| capacity; HENRY PATTERSON, individually | § | |
| and in his official capacity; TOMMYE | § | |
| PRESSLEY, individually and in her official | § | |
| capacity; HARRY WILLIAMS; PHILIP | § | |
| COOK, individually and in his official | § | |
| capacity; KIMMONS SECURITY | § | |
| SERVICES, INC.; JAMES W. DUNBAR, | § | |
| individually; VANESA BRASHIER, | § | |
| individually; and ASP WESTWARD, L.P., | § | |
| doing business as Cleveland Advocate, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## ORDER GRANTING DEFENDANT CITY OF CLEVELAND'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sonya Scott was terminated from her position as Defendant City of Cleveland's

dispatch supervisor for committing various violations of City policies, including the fact that in

March 2007, there was a nearly five-and-one-half-minute delay between the time an officer

requested an ambulance and the time Ms. Scott toned for EMS.[1] Ms. Scott has failed to

---

[1] The court previously granted the motion for summary judgment of Defendants Ike Hines, Henry Patterson, Tommye Pressley, Harry Williams, and Philip Cook (collectively "City Official Defendants"). [*See* Doc. #43.]

1

demonstrate a fact issue regarding whether the City's stated reasons for her termination are pretextual, or whether race or sex was a determinative factor in her termination, and the City is therefore entitled to summary judgment on Ms. Scott's Title VII, Texas Commission on Human Rights Act, and Section 1981a claims. Further, Ms. Scott has not demonstrated a fact issue regarding whether an official policy promulgated by the City's final policymaker, the Cleveland City Council, was the moving force behind a violation of her constitutional rights. Therefore, the City is entitled to summary judgment on Ms. Scott's Section 1983 claims for equal protection and due process.

## I. Background

Cleveland ("the City") is a Texas home rule municipality, operating under a home rule charter.[2] Under the City's charter, "all powers of the city shall be vested in . . . the 'city council,' which shall enact local legislation, . . . determine policies and appoint the city manager, who in turn shall execute the laws and administer the government of the city." [Doc. #42 Ex. A to Ex. 1, Cleveland City Charter ("Charter") § 1.01.] Under City policy, all hiring decisions are made by the department head, with approval by the city manager. [Doc. #42 Ex. B to Ex. 1, City of Cleveland Pers. Handbook ("Handbook") § 3-7.] The decision to dismiss an employee is also made by the department head with approval from the city manager. [Handbook § 13-7.] After an employee has been terminated, the employee can appeal the decision to the city manager, who has the final decision. [Handbook §§ 13-4, 13-7.] All employment by the City is in the form of

---

[2] Home rule cities derive their power not from the Texas Legislature, but from the Texas Constitution. *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998); *see also* Tex. Const. art. XI, § 5. A home rule city's charter is the organic law of the city, and the charter's relation to the city is comparable to the relation of the Texas Constitution to the state. *City of Fort Worth v. Morrison*, 164 S.W.2d 771, 772 (Tex. Civ. App.—Forth Worth 1942, writ ref'd).

"at will" employment. [Handbook § 1-1.] An employee may be dismissed "at any time, for any reason ascertained after careful and factual consideration." [Handbook § 13-7.]

Plaintiff Sonya Scott, an African-American female, was hired by Police Chief[3] Ike Hines in 1992 as a dispatcher for the City. [Doc. #42 Ex. 5, Hines Aff. at 1.] Defendant Hines is an African-American male. [Doc. #42 Ex. 3, Scott Dep. at 21.] In 1999, Hines promoted Scott to the position of dispatch supervisor. [Hines Aff. at 1.] As dispatch supervisor, Scott worked the phones and radios, oversaw several other dispatchers, and completed managerial tasks such as scheduling, maintaining order in the office, and disciplining. [Scott Dep. at 24-27.]

In mid-2007, City Manager Philip Cook hired Kimmons Investigative Services, Inc. ("Kimmons") to investigate reports that Ms. Scott had been observed doing personal business while still on the city time clock. [Doc. #42 Ex. 4, Cook Aff. at 1.] Defendant Cook is a Caucasian male. [Cook Aff. at 1.] Due to the fact that some of Ms. Scott's subordinates had voiced fear of reprisal for providing sworn statements to the investigators, Cook asked Chief Hines to place Ms. Scott on administrative leave with pay for the duration of the investigation. [Cook Aff. at 2.] Chief Hines placed Ms. Scott on administrative leave on August 30, 2007. [Hines Aff. at 1; *see also* Doc. #37 Ex. B, Scott Aff. at 1 (Scott signed letter of administrative leave on September 9).] Mr. Cook later decided to widen the scope of the investigation after Kimmons reported "various incidents" it had uncovered. [Cook Aff. at 2.]

In November 2007, Chief Hines reviewed the investigative report prepared by Kimmons and, based on the report, decided that it was in the City's best interest to terminate Ms. Scott. [Hines Aff. at 1-2.] He later met with Defendant Patterson, who was the Assistant Police Chief,

---

[3] The Chief of Police is a department head. [Handbook § 2-1.]

City Manager Cook, and Brian Begle, who was the City Attorney, to discuss the Kimmons report. [Hines Aff. at 2.] On November 20, 2007, Hines signed Scott's termination letter. [Hines Aff. at 2; Hines Aff. Ex. A, Letter Re: Termination of Employment ("Termination Letter").] He then called Scott to his office and gave her the letter. [Scott Dep. at 98.]

The termination letter states three grounds for Ms. Scott's termination: (1) on March 6, 2007, there was a nearly five-and-one-half-minute delay between a radio call from Officer Kevin Potter requesting an ambulance and the time Scott "toned" for EMS; (2) a determination that Scott had instructed a subordinate to listen in on a private conversation between coworkers by turning up the volume on a surveillance camera locate outside of the Dispatch area; and (3) a determination that Scott's supervision of the Dispatch office was inadequate, her lack of leadership, and serious morale problems among the dispatchers under Scott's supervision. [Termination Letter at 1.] Hines thought that the first reason, Scott's failure to tone promptly for EMS when Officer Potter requested it, was itself a sufficient reason for her termination, since it involved conduct that was potentially life-threatening to an officer on duty. [Hines Aff. at 2.] According to Hines, the other two reasons "were less weighty" in his decision. [Hines Aff. at 2.] Ms. Scott appealed her termination to City Manager Cook. [Cook Aff. at 2; Scott Aff. at 3.] After a hearing at which Ms. Scott and her attorney appeared, and at which Ms. Scott was "allowed to say anything and everything" she wanted, Cook affirmed Chief Hines's termination decision on January 17, 2008. [Cook Aff. at 2.]

Scott filed a lawsuit in state court on November 14, 2008, and the suit was removed to this court on December 8, 2008. [*See* Doc. #1, Defs.' Notice of Removal.] The court previously dismissed Plaintiff Scott's intentional infliction of emotional distress claim against the City. [*See*

Doc. #27 at 11.] Plaintiff Scott's remaining claims against the City are as follows: (1) a race and sex discrimination claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; (2) a race and sex discrimination claim under the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code Ann. §§ 21.001-21.556 (Vernon 2006); (3) a race discrimination claim under 42 U.S.C. § 1981a; (4) an equal protection claim under 42 U.S.C. § 1983 based on race and sex discrimination; and (5) a due process claim under 42 U.S.C. § 1983 based on deprivation of property and liberty interests in her employment.

## II. Summary Judgment Standard of Review

A party may move for summary judgment on all or part of a claim. Fed. R. Civ. P. 56(a), (b). A summary judgment motion should be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only a genuine dispute over a material fact—a fact that might affect the outcome of the suit under the governing substantive law—will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment under Rule 56 has the burden of demonstrating that no material fact issue exists. *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514. If the City meets this burden, then Plaintiff Scott, as the nonmoving party, must bring forth affirmative evidence in order to defeat the summary judgment motion.[4] *Anderson*, 477 U.S. at 257, 106 S. Ct. at 2514.

---

[4] Rule 56 does not impose upon the court a duty to sift through the record in search of evidence demonstrating a genuine issue of material fact. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992). Rather, it is the duty of the non-moving party to point out such evidence. *Id.* Plaintiff Scott has not responded to the City's summary judgment motion, and therefore the court assumes she has no opposition. *See* L.R. CV-7(d). The court will, however, consider the

5

Scott "may not rely merely on [the] allegations or denials" of the pleadings, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Further, as the nonmoving party, Scott "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).

Rule 56 requires the court to consider "the pleadings, the discovery and disclosure materials on file, and any affidavits." Fed. R. Civ. P. 56(c). The court must view all facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1356. However, only *reasonable* inferences in favor of the nonmoving party can be drawn from the evidence. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468, 112 S. Ct. 2072, 2083 (1992).

### III. Title VII Claims

**A. Applicable Law**

Title VII makes it unlawful for an employer to "discharge any individual . . . because of such individual's race . . . [or] sex." 42 U.S.C. s 2000e-2(a)(1). To establish a prima facie case of discrimination under Title VII, a plaintiff may prove her claim either with direct evidence, such as statistical proof, or with circumstantial evidence. *Urbano v. Cont'l Airlines, Inc.*,

---

arguments in, and evidence submitted with, Ms. Scott's response to the City Official Defendants' motion for summary judgment [Doc. #37] and Ms. Scott's response to the City's motion for partial judgment on the pleadings [Doc. #18] in determining whether summary judgment against the City is appropriate. *See Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1022-23 (5th Cir. 1995) (citing *John v. La. (Bd. of Trustees for State Colls. & Univs.)*, 757 F.2d 698, 708-09 (5th Cir. 1985)) (non-movant's lack of opposition to summary judgment motion not sufficient basis for grant of summary judgment; movant must still establish absence of genuine issue of material fact in order to prevail).

138 F.3d 204, 206 (5th Cir. 1998). When a plaintiff offers circumstantial evidence, the burden-shifting analysis outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green* is used. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected group; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the defendant employer; and (4) she was replaced by someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). Once a prima facie case is established, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 557. This burden is only one of production, not persuasion, and involves no credibility assessment. *Id.*

If the employer meets its burden of production, the burden then shifts back to the plaintiff, who bears the ultimate burden of proving that the proffered reason is a pretext for discrimination. *Id.* To carry this burden, the plaintiff must rebut each non-discriminatory reason articulated by the employer. *Id.* Ms. Scott can avoid summary judgment if the evidence taken as a whole (1) creates a fact issue as to whether each of her employer's stated reasons was what actually motivated the employer, and (2) creates a reasonable inference that race or sex was a determinative factor in the employer's actions. *See Vadie v. Miss. State Univ.*, 218 F.3d 365, 374 n.23 (5th Cir. 2000). However, Scott "must produce substantial evidence of pretext." *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402-03 (5th Cir. 2001). "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the

proffered reason is false; a mere shadow of a doubt is insufficient." *Id.* at 403 (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)).

**B. Discussion**

With regard to Ms. Scott's prima facie case, it is undisputed that she is a member of two protected groups; she is African-American, and she is female. *See* 42 U.S.C. § 2000e-2(a)(1) (unlawful for employer to discriminate on the basis of race or sex). The court will presume for purposes of analysis that Scott has at least raised a fact issue as to whether she was qualified for her position as dispatch supervisor. With regard to the third element of her prima facie case, it is undisputed that Scott was discharged from her position. With regard to the fourth element, Scott alleges that she was treated less favorably than other similarly situated employees outside her protected groups, because other males in the department have been investigated without being placed on administrative leave [*See* Doc. #37 at 8; Doc. #23, Pl.'s First Am. Compl. at 15], and because no other employee has been investigated by an outside agency such as Kimmons [Doc. #23 at 15]. The court will again presume for purposes of analysis that Scott has at least raised a fact issue as to the fourth element, and thus the burden shifts to the City to produce a legitimate, non-discriminatory reason for Scott's termination.

The City adopts the arguments made by the City Official Defendants in their summary judgment motion with respect to Ms. Scott's Section 1983 equal protection claims.[5] [Doc. #42, Def. City's Mot. for Summ. J. at 17-18.] With regard to the decision to terminate Scott, the City has asserted three legitimate, non-discriminatory reasons for Scott's termination, namely that

---

[5] Section 1983 and Title VII are "parallel causes of action," and the inquiry into intentional discrimination is essentially the same for actions brought under both statutes. *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 166 (5th Cir. 2007).

(1) in March 2007, nearly five-and-one-half minutes elapsed between the time Officer Potter requested an ambulance and the time Ms. Scott toned for EMS; (2) it was determined that Scott had instructed a subordinate to eavesdrop on a private conversation between coworkers by turning up the volume on a surveillance camera located outside the dispatch area; and (3) it was determined that Scott's supervision of the dispatch office was inadequate, causing serious morale problems among the dispatchers. [*See* Termination Letter at 1.] Thus it is Ms. Scott's burden to show that each of these reasons is pretextual.

*1. Police Chief Ike Hines*

Chief Hines made the decision to place Scott on administrative leave while the Kimmons investigation was pending, and, as the department head, made the decision to terminate Scott. Hines was also the city official who made the decision to hire Scott in 1992, and who promoted her to a supervisory position in 1999, which gives rise to an inference that discrimination was not the motive behind his decision to place her on leave or to terminate her, an inference that is enhanced by the fact that Hines, himself an African-American, is a member of one of the protected classes to which Scott belongs. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated in part on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000).

With respect to Hines's decision to place Scott on leave, merely placing an employee on paid administrative leave is not itself an adverse employment action. *See Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000). The court has previously held that, to the extent the placement of Scott on administrative leave constitutes treatment different than that of other similarly situated employees, Scott has failed to raise a fact issue regarding whether Hines's

stated reason, namely that this decision was made based on reports that some of Ms. Scott's subordinates feared reprisal for providing information to the investigators, is pretextual. [*See* Doc. #43, Order Granting City Official Defs.' Mot. for Summ. J. at 23-24.] With respect to Hines's decision to terminate Scott, the court has held that Scott has failed to raise a fact issue as to whether Hines's primary reason for firing Scott, namely her delay in toning for EMS during the Officer Potter incident, is pretextual. [*See* Doc. #43 at 24-27.] The video recording of the Officer Potter incident confirms that there was a delay of nearly five-and-one-half minutes between the time Officer Potter first requested EMS and the time Scott toned for EMS. [*See* Doc. #42 Ex. A to Ex. 10, Videotape of Potter Incident ("Potter Video").] Regardless of the reason for the delay, no reasonable trier of fact could conclude that the delay did not occur.

*2. City Manager Philip Cook*

City Manager Cook initiated the investigation of Ms. Scott and suggested to Chief Hines that Scott be placed on administrative leave during her investigation; Cook also affirmed Chief Hines's decision to terminate Scott. Investigating alleged violations of departmental policies is not itself an adverse employment action, nor is placing an employee on paid administrative leave. *See Breaux*, 205 F.3d at 158. The court has previously held that, to the extent the decision to use an outside investigative firm treated Scott differently than other similarly situated employees, Scott has failed to raise a fact issue regarding whether Cook's stated reason, namely that an outside firm was used to avoid any potential charge of favoritism because Scott was the daughter of a former city councilman, is pretextual. [*See* Doc. #43 at 33-36.] Likewise, the court has held that, to the extent the placement of Scott on administrative leave constitutes treatment different than that of other similarly situated employees, Scott has failed to raise a fact issue as to

whether Cook' stated reason, that some of Scott's subordinates feared reprisal for providing information to the investigators, is pretextual. [*See* Doc. #43 at 33-36.] Finally, Cook states that he affirmed Hines's decision to terminate Ms. Scott based on the Kimmons report, and on the fact that Scott and her attorney did not offer, either in Scott's appeal brief or at the appeal hearing, any additional evidence to persuade him that Hines's decision rested on any incorrect assumptions. [Cook Aff. at 2.] The court has held that Scott has not demonstrated a fact issue as to whether this stated reason is pretextual. [*See* Doc. #43 at 36-38.]

*3. Assistant Police Chief Henry Patterson*

Henry Patterson is a white male and was the Assistant Police Chief at the time of Scott's termination. [Hines Aff. at 1.] Assistant Chief Patterson supervised internal affairs, but did not have hiring and firing authority. [Hines Aff. at 1; *see also* Doc. #42 Ex. 2, Org. Chart; Doc. #37 at 24; Scott Dep. at 40.] Scott alleges that Patterson sought to have her terminated, and that he caused several City employees to provide false or misleading statements about her to the Kimmons investigators. [Doc. #23 at 6-7; Doc. #37 at 5.] She also alleges that Patterson initiated two internal investigations against her prior to the Kimmons investigation. [Scott Dep. at 42.] As noted above, investigating alleged violations of departmental policies is not itself an adverse employment action. *Breaux*, 205 F.3d at 158. Further, the internal investigations to which Scott refers were not initiated by Patterson, and were conducted by other detectives, not Patterson. [Patterson Aff. at 1-2; *see also* Doc. #37 at 4 (discussing the investigations and failing to point to any evidence that Patterson was involved).] The court has previously held that Ms. Scott has failed to raise a fact issue as to whether Patterson caused her termination, and even if he did, whether he did so with a discriminatory motive. [*See* Doc. #43 at 28-30.]

*4. City Councilman Harry Williams*

Harry Williams, a white male, is a member of the Cleveland City Council. [Cook Aff. at 1.] As a Councilman, Williams does not have hiring and firing authority over rank-and-file employees. [*See* Charter §§ 3.07, 4.01(c); Handbook § 13-7; Doc. #37 at 25.] Williams states that he did not urge Chief Hines or City Manager Cook to terminate Scott's employment, and that he did not participate with the City Council in any action urging that any adverse employment action be taken toward Scott. [Doc. #42 Ex. 7, Williams Aff. at 1.] Scott alleges that Williams worked in conjunction with Assistant Chief Patterson to get Scott fired. [Doc. #37 at 25; *see* Doc. #37 Ex. D, Aff. of Willie Carter ("Carter Aff.") at 1 (Williams instructed Patterson to initiate an investigation of Scott).] An investigation is not itself an adverse employment action. *Breaux*, 205 F.3d at 158. The court has previously held that Scott has failed to demonstrate a fact issue as to whether Williams caused her termination or whether he did so with a discriminatory motive. [*See* Doc. #43 at 31-33.]

*5. Dispatcher Tommye Pressley*

Defendant Pressley is a white female and was a dispatcher under Scott's supervision. [Scott Dep. at 25.] Pressley had no hiring and firing authority. [Scott Dep. at 72.] Scott alleges that Pressley made false statements to the Kimmons investigators in an effort to get Scott fired. [Doc. #23 at 6-7; Doc. #37 at 25-26; *see, e.g.*, Kimmons Report at 14 (Pressley told Kimmons that during the Officer Potter incident, Scott was on the phone with her husband talking about their son learning to whistle).] False accusations, without more, are not adverse employment actions. *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998). Any inference that Pressley discriminated against Scott because of sex is undermined by the fact that Pressley is

also a woman. *See CSC Logic*, 82 F.3d at 658. Further, Scott admits that Pressley probably would have made the statements she made to Kimmons about anyone—black, white, male, or female. [Scott Dep. at 70.] The court has previously held that Scott has failed to establish a fact issue as to whether Pressley caused Scott's termination, or whether any allegedly false statements made by Pressley were made with a discriminatory motive. [*See* Doc. #43 at 30-31.]

Ms. Scott has not demonstrated a genuine fact issue as to whether the City's stated reasons for terminating her are pretextual, or whether race or sex was a determinative factor in her termination. Therefore, the City is entitled to summary judgment on Scott's Title VII claims.

## IV. Texas Commission on Human Rights Act Claims

Under the TCHRA, it is unlawful for an employer to discharge an individual because of race or sex. Tex. Lab. Code Ann. § 21.051(1) (Vernon 2006). The TCHRA was enacted to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964." Tex. Lab. Code Ann. § 21.001 (Vernon 2006). Therefore, Texas courts look to analogous federal statutes and the cases interpreting them to guide their reading of the TCHRA. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475-76 (Tex. 2001) ("Section 21.051 is substantively identical to its federal equivalent in Title VII . . . ."); *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 530 (S.D. Tex. 1999) (legislature drafted TCHRA to "correlat[e] state law with federal law in the area of discrimination in employment"; TCHRA "is interpreted in a manner consistent with federal laws prohibiting employment discrimination"), *aff'd*, 224 F.3d 765 (5th Cir. 2000). Therefore, in accordance with analogous federal Title VII precedent, the City is entitled to summary judgment with respect to Ms. Scott's TCHRA claims for the same reasons it was entitled to summary judgment with respect to Ms. Scott's Title VII claims.

**V. Section 1981a Race Discrimination Claims**

Section 1981a does not create a new substantive right or cause of action; it merely

provides an additional remedy for unlawful discrimination prohibited by Title VII. *Huckabay v.*

*Moore*, 142 F.3d 233, 241 (5th Cir. 1998). "[T]itle VII, then, provide[s] the underlying

substantive right . . . ." *Id.* Thus, for the same reasons the City was entitled to summary judgment

with respect to Scott's Title VII claims, it is likewise entitled to summary judgment with respect

to Scott's Section 1981a claims.[6]

**VI. Section 1983 Equal Protection Claims**

**A. Applicable Law**

A city is not liable under Section 1983 on the theory of respondeat superior. *Peterson v.*

*City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*

*of N.Y.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)). To establish municipal liability under

Section 1983, a plaintiff must show that an official policy promulgated by the municipal

---

[6]  It is slightly unclear whether Ms. Scott is asserting discrimination claims under 42 U.S.C.
§ 1981a or under 42 U.S.C. § 1981. The City Official Defendants' motion for summary
judgment [Doc. #30], and Plaintiff's response [Doc. #37], addressed claims under Section 1981a.
[*See* Doc. #30 at 13; Doc. #37 at 20.] However, the City's motion for summary judgment [Doc.
#42], to which Plaintiff did not respond, addresses claims under Section 1981. [*See* Doc. #42 at
11.] Ms. Scott's complaint states that she brings discrimination claims against the City under
Section 1981. [*See* Doc. #23 at 7, 12.] To the extent that Scott brings claims under Section 1981
rather than Section 1981a, those claims are addressed in Parts VI and VII of this order (and as to
the City Official Defendants, in Parts VII and VIII of Doc. #43), which discuss Scott's
Section 1983 claims. *See Jett v. Dallas Indep. Sch. Dist.* (*Jett I*), 491 U.S. 701, 731, 109 S.
Ct. 2702, 2721 (1989) (Section 1983 is controlling in context of damages actions brought against
state actors for violations of rights declared in Section 1981); *Oden v. Oktibbeha County, Miss.*,
246 F.3d 458, 463 (5th Cir. 2001) (holding in *Jett* that plaintiffs must assert cause of action
under Section 1983 to remedy violations of civil rights under Section 1981 remains applicable
after 1991 amendment to Section 1981); *Meyers v. La Porte Indep. Sch. Dist.*, 277 F. App'x 333,
335 (5th Cir. 2007) (Section 1981 claim cannot be brought independently of Section 1983
claim).

policymaker was the moving force behind the violation of a constitutional right. *Id.* An official policy can arise in various forms. *Id.* It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Id.* (citing *Jett I*, 491 U.S. at 737, 109 S. Ct. at 2723-24). Thus, a plaintiff must show that the policy was promulgated by the municipality's final policymaker. *Id.* Finally, a plaintiff must also establish that there is a direct causal link between the policy and the constitutional violation. *Id.* at 848.

**B. Discussion**

*1. Alleged Constitutional Violation*

Scott, an African-American female, alleges discrimination on the basis of race and sex. [Doc. #37 at 22.] Sex discrimination by a public employer violates the Equal Protection Clause of the Fourteenth Amendment, *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997), as does discrimination based on race, *see Crawford-El v. Britton*, 523 U.S. 574, 585, 118 S. Ct. 1584, 1590 (1998).

*2. Final Policymaker*

The identity of the final policymaker is a question of state and local law. *See Jett I*, 491 U.S. at 737, 109 S. Ct. at 2723-24; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300 (1986). The court must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged

to have caused the constitutional or statutory violation at issue. *Jett v. Dallas Indep. Sch. Dist.* (*Jett II*), 7 F.3d 1241, 1244 (5th Cir. 1993). This is accomplished by reviewing the relevant legal materials, including state and local positive law, as well as "custom or usage" having the force of law. *Id.*; *Pembaur*, 475 U.S. at 483, 106 S. Ct. at 1300 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . .").

In this case, the Cleveland City Charter makes clear that the City Council is the final policymaking body for the city. [*See* Charter § 1.01 ("[A]ll powers of the city shall be vested in . . . the 'city council,' which shall . . . determine policies and appoint the city manager, who in turn shall execute the laws and administer the government of the city."); *id.* § 3.07 ("All powers of the city and the determination of *all* matters of policy shall be vested in the city council." (emphasis added)).] The city manager is not a final policymaker. [*See* Charter § 4.01(a) (city manager is chief administrative and executive officer of the city and "shall be responsible to the city council"); *id.* § 4.01(c) (enumerating powers and duties of city manager, which include power to appoint and remove city employees, but do not include policymaking power).] It is the City Council, and not the city manager or any other city official, that adopted the City of Cleveland Personnel Handbook, which contains provisions for hiring and firing city employees. [*See* Handbook.]

Since Cleveland's employment policy is set by the City Council, only that body's decisions would provide a basis for city liability. *See Jett II*, 7 F.3d at 1247 n.12. This would be true even if the Council left a city official the discretion to hire and fire employees and the official exercised that discretion in an unconstitutional manner. *See id.* Here, the City Council

left discretion to hire and fire employees to department heads and the city manager, and also delegated to the city manager the final decision in cases of protested terminations and disciplinary actions. [*See* Handbook § 3-7 (all hiring decisions made by department head with approval by city manager); *id.* § 13-7 (decision to dismiss employee made by department head with approval by city manager); *id.* §§ 13-4, 13-7 (employee may appeal disciplinary action or termination to city manager, who has the final decision).] However, this does not mean that the city manager has or was delegated the status of policymaker, much less final policymaker, with respect to employee terminations and disciplinary actions. *See Jett II*, 7 F.3d at 1246 (fact that school Superintendent had been delegated final decision in cases of protested employee transfers did not mean he had or had been delegated status of policymaker). Thus, the individuals who made and affirmed the decision to terminate Ms. Scott in this case, namely Chief Hines and City Manager Cook, were not final policymakers.

*3. Official Policy*

Ms. Scott alleges that the City Council had knowledge of the actions taken by Chief Hines and City Manager Cook, and that their actions were approved as official actions of the City. [*See* Doc. #18 at 4-5.] A policymaker's adoption of a course of action in a particular situation may impose liability onto a municipality. *Pembaur*, 475 U.S. at 481, 106 S. Ct. at 1299; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988) (plurality opinion) (if policymaker approves a subordinate's decision and the basis for it, the ratification would be chargeable to the municipality). However, in this case, Ms. Scott admits that she is not aware of the City Council ever voting to ratify her termination. [Scott Dep. at 61.] Further, there is no indication in the minutes of any City Council meeting from June 2007 through January 2008 that

the Council took any action to direct a city official to investigate Ms. Scott, suspend her employment, or terminate her employment. [Doc. #42 Ex. 1, McDonald Aff. at 1.]

Merely "going along" with discretionary decisions made by a non-policymaker is not enough to impose liability onto a municipality. *Praprotnik*, 485 U.S. at 130, 108 S. Ct. at 927; *see also Peterson*, 588 F.3d at 848 (theory of ratification limited to "extreme factual situations"); *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1409 (5th Cir. 1995) (inaction of municipality can give rise to Section 1983 liability "only where the inaction is indicative of an official policy or custom that manifests deliberate indifference toward the rights of the injured persons"). Further, any allegation of race or sex discrimination by the City Council is undermined by the fact that at the time of Scott's termination, the City Council included two African-American members and three female members. *See* [Cook Aff. at 1 (Council composed of one Caucasian female, three Caucasian males, and two African-American females)]; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 n.2, 113 S. Ct. 2742, 2748 n.2 (1993) (inference of racial discrimination undermined by fact that two members of disciplinary review board were of same race as plaintiff). Even if the Council had ratified the actions of Chief Hines and City Manager Cook, Ms. Scott has not shown that there is a fact issue as to whether the actions of those officials were discriminatory. *See supra* Part III.B.1 (discussing Hines); *supra* Part III.B.2 (discussing Cook).

Therefore, Ms. Scott has not shown that there is a genuine issue of fact as to whether an official policy or custom promulgated by the City's final policymaker, the Cleveland City Council, was the moving force behind a violation of her constitutional right to equal protection,

and the City is entitled to summary judgment with respect to Scott's Section 1983 equal protection claims.

## VII. Section 1983 Due Process Claims

Ms. Scott alleges that the manner in which she was terminated violated her right to due process. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. Similarly, substantive due process offers protection to an individual only if that person has either a constitutionally protected property interest, or a similarly protected liberty interest." *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006) (citations omitted). Therefore, the court must first examine the property and liberty interests at stake and determine whether either procedural or substantive due process safeguards apply.

### A. Property Interest

The court has previously held that, as an at-will employee, Ms. Scott did not have a property interest in her employment as a dispatcher. [*See* Doc. #43 at 11-13.] Therefore, the City is entitled to summary judgment as to any Section 1983 due process claims based on a property interest in her employment.

### B. Liberty Interest

With regard to any Section 1983 claims based on a liberty interest in her employment, Ms. Scott must show that an official policy promulgated by the municipal policymaker was the moving force behind a violation of her constitutional right to due process. *See Peterson*, 588 F.3d at 847.

*1. Alleged Constitutional Violation*

The liberty interests protected by the Fourteenth Amendment include the freedom to work and earn a living. *Whiting*, 451 F.3d at 347. If the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear her name. *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 2707 (1972); *Rosenstein v. City of Dallas, Tex.*, 876 F.2d 392, 395 (5th Cir. 1989). A liberty interest is implicated, and the right to notice and an opportunity to clear one's name arises, only when the employee is discharged in a manner that stigmatizes her and forecloses her from other employment opportunities. *Bledsoe*, 449 F.3d at 653; *see also Roth*, 408 U.S. at 573, 92 S. Ct. at 2707.

Neither damage to reputation alone, nor the stigma resulting from the discharge itself trigger the protections of due process. *Bledsoe*, 449 F.3d at 653. To prevail on a Section 1983 claim based upon deprivation of liberty without notice or an opportunity to clear one's name, a plaintiff must show that: (1) she was discharged; (2) stigmatizing charges were made against her in connection with the discharge; (3) the charges were false; (4) she was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) she requested a hearing to clear her name; and (7) the request was denied. *See id.* A name-clearing hearing need not be provided prior to publicizing the charges or prior to discharging the employee; deprivation of a liberty interest occurs only when an employee's request for an opportunity to contest the charges and clear her name is denied. *Rosenstein*, 876 F.2d at 396 n.8.

*2. Final Policymaker*

As discussed above, the Cleveland City Council is the final policymaking body for the City of Cleveland. *See supra* Part VI.B.2.

*3. Official Policy*

It is undisputed that (1) Scott was discharged from her position as dispatch supervisor. Scott alleges that: (2) stigmatizing charges, namely that she committed eavesdropping violations, destroyed evidence, endangered the life of Officer Potter, caused low morale in the dispatch office, and cheated on her time, were made against her in connection with her discharge; (3) these charges were false; and (4) she was not provided an opportunity to be heard prior to her discharge. [Doc. #37 at 27-28.] With regard to element (6), the court has previously held that Ms. Scott's request for an appeal pursuant to the City's established appeal procedure, along with her appeal brief alleging that she was "publicly humiliated" when information about her investigation and termination was released to the media, were sufficient to state a request for a name-clearing hearing. [*See* Doc. #43 at 16-17.]

With respect to element (5), Ms. Scott has not demonstrated a fact issue as to whether an official policy or custom promulgated by the City Council was the moving force behind publicizing the charges against her. Ms. Scott alleges that the charges against her were made public and published in the Cleveland Advocate newspaper. [Doc. #37 at 28.] "To prove deprivation of . . . a liberty interest, a public employee must show that his employer has made or is likely to make the allegedly stigmatizing charges public in any official or intentional manner." *In re Selcraig*, 705 F.2d 789, 796 n.6 (5th Cir. 1983) (quoting *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir. 1975)) (internal quotation marks omitted); *see also Hughes v. City of Garland*,

204 F.3d 223, 227 (5th Cir. 2000) (public disclosure must be "fairly attributable" to the defendant city).

Some City employee apparently disclosed the Kimmons report to the newspaper pursuant to the Texas Open Records Act, *see* Tex. Gov't Code Ann. §§ 552.001-552.353 (Vernon 2004). [*See* Doc. #41 Ex. C, Brashier Aff. at 1 (pursuant to Open Records Act, reporter Brashier sent email to City Manager Cook and City Secretary McDonald requesting copy of investigation into Ms. Scott; "[s]omeone at the City" prepared copy of Kimmons report, which Brashier picked up from Cook's office).] However, even if disclosure of the Kimmons report was improper under the Open Records Act, the court has found no evidence in the record indicating that the City Council, through some official act or policy, authorized the disclosure, or that there was a widespread practice or custom of disclosing such information that fairly represents City policy. Nor has the court found any evidence that the City Council ratified the act of some city official or employee who provided the Kimmons report to the newspaper. *See Pembaur*, 475 U.S. at 481-82, 106 S. Ct. at 1299 ("The fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").

Further, with respect to element (7), Ms. Scott has not demonstrated a fact issue as to whether an official policy or custom promulgated by the City Council was the moving force behind the denial of a name-clearing hearing. Scott was given access to the City of Cleveland's established appeal procedure, which included a hearing before City Manager Cook. The court has previously held that Ms. Scott was on adequate notice of the reasons for her termination, that she was provided with an explanation of the City's evidence, and that her appeal hearing

afforded her an adequate opportunity to speak on her own behalf, to refute the charges against her, and to clear her name. [*See* Doc. #43 at 17-19.]

Ms. Scott's hearing was not open to the public. [*See* Doc. #30 at 28 ("The hearing was conducted in a city office since Scott did not request that it be opened to the public.").] However, the court has found no evidence in the record indicating that the City Council, through some official act or policy, directed that Ms. Scott's appeal hearing be closed to the public, or that there was a widespread practice or custom of holding non-public name-clearing hearings that fairly represents City policy. Further, the court has found no evidence indicating that the City Council ratified any decision by a city official or employee to close the hearing to the public, and even if the Council had done so, such ratification would not be sufficient to impose liability on the City, because a requirement that a name-clearing hearing be public even though the employee did not request a public hearing was not clearly established law at the time Ms. Scott's appeal hearing was held.[7] *See World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) ("[U]nless the [non-policymaker's] actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's

_____

[7]  The court has found no Fifth Circuit or Supreme Court case holding that an employee who acquiesces in a non-public appeal hearing without requesting that the hearing be opened to the public or later asking for a public name-clearing hearing has established element (7) of a deprivation of liberty due process cause of action. For instance, in *Rosenstein*, the Fifth Circuit held that an employee who requests access to established appeal or grievance procedures has sufficiently stated a request for name-clearing hearing, and that in such a case, the employer may either grant the discharged employee access to the established appeal procedures, or provide an alternative procedure solely for purpose of allowing the employee to clear his or her name. *See* 876 F.2d at 396. However, the court in *Rosenstein* did not reach the issue of whether, if an employer grants access to its established appeal procedures, such procedures must be open to the public, because in *Rosenstein*, the employer had denied altogether the employee's request to appeal his discharge decision. *See id.* at 396-97.

ratification . . . of [the] actions is insufficient to establish an official policy or custom."); [Doc. #43 at 19-20 (holding that, to the extent that due process might require a *public* name-clearing hearing, such a requirement is not clearly established by Fifth Circuit precedent, nor is it clearly established by a consensus of persuasive authority from other circuits)].

Therefore, Ms. Scott has not shown that there is a genuine issue of fact as to whether an official policy or custom promulgated by the City's final policymaker, the Cleveland City Council, was the moving force behind a violation of her constitutional right to due process, and the City is entitled to summary judgment with respect to Scott's Section 1983 due process claims.

## VIII. Conclusion

For the foregoing reasons, the City of Cleveland's Motion for Summary Judgment [Doc. #42] is hereby **GRANTED**.

So **ORDERED** and **SIGNED** this **1** day of **March, 2010.**

_Ron Clark_
_____
Ron Clark, United States District Judge